396 A.2d 662

**COMMONWEALTH of Pennsylvania**

v.

**Ronald MAYFIELD, a/k/a Johnson, Appellant.**

Superior Court of Pennsylvania.

Argued April 14, 1978.

Decided Dec. 28, 1978.

Petition for Allowance of Appeal Denied June 15, 1979.

Michael J. Veshecco, Erie, for appellant.

Robert H. Chase, District Attorney, Erie, submitted a brief for Commonwealth, appellee.

Before JACOBS, President Judge, and HOFFMAN, CERCONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

PER CURIAM:

The six Judges who decided this appeal being equally divided the judgment of sentence is affirmed.

HESTER, J., files an opinion in support of affirmance in which PRICE and VAN der VOORT, JJ., join.

CERCONE, J., files an opinion in support of reversal.

SPAETH, J., files an opinion in support of reversal in which JACOBS, President Judge, joins.

HOFFMAN, J., did not participate in the consideration or decision of this case.

100

OPINION IN SUPPORT OF AFFIRMANCE

HESTER, Judge:

Presently before the Court is Appellant's appeal from the judgment of sentence from Appellant's conviction for violations of "The Controlled Substance, Drug, Device and Cosmetic Act" [1] to-wit, Possession of Heroin and Possession of Heroin with Intent to Deliver, and Criminal Conspiracy (18 Pa.C.S.A. 903).

Following Appellant's conviction by a jury, his Motions for New Trial and/or in Arrest of Judgment, were timely filed, argued and subsequently denied.

On August 4, 1977, Appellant was sentenced to a term of imprisonment of 4 to 8 years. Thereafter, this timely Appeal.

Appellant posits four arguments in support of the present appeal.

We are of the considered opinion that all of the Appellant's contentions are without merit and therefore we affirm the judgment and sentence of the lower court.

Appellant first posits that the search warrant or affidavit of probable cause was defective in two material respects: (a) that the description of the place to be searched lacked the requisite specificity, and (b) the allegations contained therein were "stale".

We do not agree. The search warrant describes the premises to be searched as "549 West 10th Street, Erie, Pennsylvania. A 2½ white aluminum sided *multi-unit dwelling*, the front door is on the east side of the residence facing north, the *downstairs apartment*. Has grey steps leading to the front porch." (Emphasis added). It was in this downstairs unit that the contraband was seized and Appellant arrested.

Pennsylvania Rule of Criminal Procedure 2005(c) requires:

1. Act of 1972, April 14, P.L. 233, No. 64, effective June 14, 1972. Possession—35 P.S. 780–113(a)(16). Possession with Intent to Deliver—35 P.S. 780–113(a)(30).

Each search warrant shall:

(c) name or describe with particularity the person or place to be searched.

Moreover, when faced with a comparable situation in *Commonwealth v. Kaplan,* 234 Pa.Super. 102, 339 A.2d 86, 87, 88 (1975), we stated:

"In *Commonwealth v. Fiorini,* 202 Pa.Super. 88, 195 A.2d 119 (1963), we held that it is not necessary to a valid description of an apartment that its location within a particular building be given. To the contrary, a search warrant directing a search of an apartment house occupied by a number of different tenants, which states the name of the person occupying the apartment to be searched is valid. *Commonwealth v. Fiorini,* supra. Turning to the search warrant at issue in the instant case, it is apparent that the warrant set forth the name of the occupant of the apartment to be searched, the street address of the apartment building, and its location on the third floor of the building in which it was situated. Thus, the warrant measured up to the standard enumerated in *Fiorini* supra."

We find that in the instant case the description of the place to be searched was sufficiently specific and satisfied the standards set forth in Pennsylvania Rule of Criminal Procedure 2005(c) and *Fiorini* (supra) and *Kaplan* (supra).

We similarly conclude that the affidavit of probable cause was not founded on "stale" information as Appellant alleges, nor was the information contained in said affidavit legally insufficient so as not to justify the issuance of said warrant.

Neither *Commonwealth v. Simmons,* 450 Pa. 624, 301 A.2d 819 (1973), nor any other case cited by Appellant or known to this Court has held that information supplied by a reliable informant becomes "stale" with 72 hours.

Similarly, we find that the information supplied by two independent informants was sufficient to constitute probable cause for the issuance of said warrant.

■ In *U. S. v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), the Supreme Court indicated that an affidavit must contain the underlying "facts and circumstances" from which the issuing authorities could find "probable cause". As in the instant case, when the information is hearsay and is received from police informants, four factors should be considered: 1) accurate information previously given by the informant, 2) corroboration of the informant's story by other sources, 3) personal and recent observations of the informant which amount to a declaration against interest, and 4) the reputation of the defendant with the police if supported by prior events within the affiant's own knowledge. *Harris,* supra at 581, 91 S.Ct. 2075. See also *Commonwealth v. Falk,* 221 Pa.Super. 43, 290 A.2d 125.

The affidavit of probable cause clearly satisfies the minimum requirements of reliability set forth above.

Next, Appellant claims that the lower court erred in permitting certain Commonwealth cross examination of a defense witness who had earlier testified as to Appellant's character. On direct examination, Mrs. Jessie Kelly testified:

"Q.  OK, how long have you known Mr. Mayfield, Ma'am?
A.  For two years.
Q.  Two years?
A.  Um-hum.
Q.  Have you ever talked to any people about Mr. Mayfield?
A.  Yes, several people.
Q.  Could you estimate for us the number of people that you have talked to about Mr. Mayfield?
A.  Five, six, or maybe more.
Q.  From talking to these people about Mr. Mayfield over a period of two years have you been able to gather an opinion as to what Mr. Mayfield's reputation in which he works or lives is as to being a peaceful truthful, law-abiding citizen?
A.  Yes.

Q. And is that reputation for being a peaceful, truthful, law-abiding citizen good or is it bad?

A. It's good."

(T. p. 132).

Thereafter, on cross the following dialogue took place:

"Q. Now, you said you discussed Mr. Mayfield's reputation for peacefulness, truthfulness and being law-abiding with other people in the community?

A. Yes.

Q. Do you recall the names of those people?

A. Yes, Mr. Hank .Washington, personnel director for Massey-Ferguson, where I am employed, Reverend Hall, he was a friend of the family's, and Mrs. Maxine Tompkins.

Q. When did these discussions take place?

A. At various times.

Q. Did these take place before or after he was arrested on these charges?

A. Oh, that was before.

Q. Do you recall how the subject of his honesty happened to come up?

A. On one occasion, talking to Hank Washington, I was telling him about the business that we had gone into and everything and he was, you know—he gave me his opinion of Ron, he thought that he was a very nice person and everything; after all, he had been employed there and he just, you know, gave special attention to him.

Q. During any of the times when you were having these conversations with other people regarding his law-abidedness and his peacefulness did any of them mention the fact that he had been convicted of attempted armed robbery?

    MR. SCARPITTI: Your Honor, I would object, we don't know when that was.

    THE COURT: What year?

    MR. MOORE: 1966.

MR. SCARPITTI: Your Honor, I am objecting; it is too remote in time to the year 1976.

THE COURT: Objection overruled. Go ahead.

A. Did anyone ever discuss that with me?

Q. Yes.

A. No, because probably if I had known it, you know, we would never have gone into business together, you know.

Q. And did anyone ever discuss the fact that he received a bad conduct discharge from the Army in 1965?

MR. SCARPITTI: Same objection, your Honor.

THE COURT: All right, same ruling.

A. No." (T. 136–8).

The decisional law of the Commonwealth is quite clear that the Commonwealth may introduce in rebuttal, evidence of prior convictions to attack the credibility of a defendant *who has elected to testify in his own behalf. Commonwealth v. Butler,* 405 Pa. 36, 173 A.2d 468 (1961); *Spencer v. Texas,* 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967).

In the instant case, Appellant contends that the lower court erred in allowing into evidence knowledge of Appellant's prior criminal record as a trial tactic in cross-examining a defense witness who had earlier testified that Appellant had a reputation as a "peaceful, truthful, law-abiding citizen".

Neither *Commonwealth v. Bighum,* 452 Pa. 554, 307 A.2d 255 (1977), nor *Commonwealth v. Werner,* 444 Pa. 458, 282 A.2d 258 (1971), is dispositive.

Appellant had "opened the door" to this line of inquiry by placing his reputation at issue vis a vis the testimony of his own witness.

Thereafter, we conclude that the lower court did not abuse its discretion when it permitted the aforequoted cross examination.

As is artfully stated in *Pennsylvania Evidence* by Henry, Ch. 4, Sec. 164, page 203:

"The witness may be cross-examined as to whether he had heard of certain specific offenses charged against defendant, or as to statements he has made inconsistent with his direct testimony, not for the purpose of proving such facts or discrediting the defendant, but solely for the purpose of affecting the credibility of the witness. (Citations omitted). The proper function of cross examination of such witnesses is not to affirmatively establish the fact of bad reputation, but to break down the basis of the testimony of the witnesses as to good reputation, a distinction being drawn between cases where it is sought to prove particular acts of misconduct and those where the purpose of the examination is to test the accuracy of the testimony of the witness as to good reputation of defendant by showing that he is not familiar with defendant's reputation, or that his standard of what constitutes good repute is unsound." (Citations omitted).

■ Appellant contends as a third basis of error that the lower court erred in permitting the Commonwealth to introduce rebuttal testimony of two witnesses, which testimony properly should have been introduced into evidence during the Commonwealth's case-in-chief. Appellant contends that the testimony of Ethel Hathaway a/k/a Ethel Nobel to the effect that she was involved with Appellant in the prior sale of drugs should not have been permitted by the lower court on rebuttal; but, rather, should have been presented during the Commonwealth's case-in-chief.

During the Commonwealth's case-in-chief, Donna Coleman testified that one of the individuals who sold heroin for the Appellant was one Ethel Nobel (T. p. 42), (T. p. 61). Moreover, during the course of the trial there were certain inconsistencies created as to how Appellant first met Ethel Hathaway a/k/a Ethel Nobel.

After taking the stand in his own defense, the Appellant testified as follows:

"Q. Did anyone come over that you know of during the day?

A. No one that I knew.

Q. Well, did anyone come over?

A. Some people came by, yes.

Q. They did come by?

A. Yes.

Q. Do you know how many people?

A. Three or four.

Q. Would you know their names?

A. No, I don't.

Q. Do you know their names today?

A. No, I don't." (T. p. 154)

And again, Appellant reiterated:

"Q. Did you hear the names that Donna Coleman mentioned this morning as the people who allegedly would come over to her house and then sell heroin?

A. Yes, I did.

Q. Did you know those people?

A. No, I don't." (T. p. 160).

Following the close of defendant's case, the Commonwealth was permitted to call Ethel Hathaway in rebuttal who testified that she knew the Appellant (T. p. 180); that he asked her to sell his drugs for him (T. p. 180); that she had been in Donna Coleman's apartment the day of Appellant's arrest (T. p. 183); that she in fact sold drugs for the Appellant:

"Q. And did he give you anything?

A. Yes, he gave me some more drugs to sell." (T. p. 181).

Thereafter, Ethel Hathaway detailed the financial transactions involved and following that was subjected to vigorous cross-examination by defense counsel.

As the Supreme Court of Pennsylvania reiterated in *Commonwealth v. Hickman,* 453 Pa. at 427, 309 A.2d 564 at 567 (1973):

"We have repeatedly held that the order of presentation of evidence is a matter which is largely within the discretion of the trial judge. The introduction of evidence by the Commonwealth, after the defense rests its case, which could have been offered by the Commonwealth during its case in chief is not necessarily grounds for reversal. *Commonwealth v. Koch,* 446 Pa. 469, 288 A.2d 791 (1972)."

We hold that the rebuttal testimony offered was properly permitted by the lower court in the exercise of its discretion and, therefore, same did not constitute an abuse of discretion so as to warrant the grant of a new trial.

■ Appellant's final contention of error is that the trial court improperly permitted the introduction of heroin into evidence at trial without the Commonwealth having first properly established its chain of custody.

The law is quite clear with respect to this issue. As we said in *Commonwealth v. Jenkins,* 231 Pa.Super. 266, 332 A.2d 490, 492 (1974):

"The admission of demonstrative evidence is a matter committed to the discretion of the trial court. *Commonwealth v. Ford,* 451 Pa. 81, 301 A.2d 856 (1973). The Commonwealth need not discount every hypothetical possibility of tampering with the evidence, but need only trace the chain of custody 'insofar as this was possible . . . .' *Commonwealth v. Greenberg,* 143 Pa.Super. 203, 215, 17 A.2d 698 (1940). 'There is no rule requiring the prosecution to produce as witnesses all persons who were in a position to come into contact with the article sought to be introduced in evidence.' *Gallego v. United States,* 276 F.2d 914, 917 (9th Cir. 1960). Physical evidence may be properly admitted despite gaps in testimony regarding custody. *United States v. De Larosa,* 450 F.2d 1057 (3rd Cir. 1971), cert. denied, 405 U.S. 927, 957, 92 S.Ct. 978, 30 L.Ed.2d 800."

Moreover, as we stated in *Commonwealth v. Miller,* 234 Pa.Super. 146, 339 A.2d 573, 578 (1975):

"There is no requirement that the Commonwealth establish the sanctity of its exhibits beyond all moral certainty. It is sufficient that the evidence, direct and circumstantial, establish a reasonable inference that the identity and condition of the exhibits remained unimpaired until they were surrendered to the court. See *Alexander v. United States,* 241 F.2d 351 (8th Cir. 1957); *United States v. Clark,* 294 F.Supp. 1108 (W.D.Pa.1968), cert. denied, 400 U.S. 820, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970)."

In the instant case, Detective Sergeant William Turner testified that after Detective Strickland searched Appellant and found an Ohio Blue Tip matchbox in Appellant's left hand front pants pocket and inside the matchbox were nine foil-wrapped packets, the following procedure was followed:

"Q. Do you have that box and those packets here today in a plastic bag?

A. Yes, this is it according to the inventory we made out, this is item number one on our police inventory.

BY THE COURT:

Q. Does that have an exhibit number?

A. It's exhibit number three.

BY MR. MOORE:

Q. And what did you do with that item?

A. This item was given by Detective Strickland to Officer David VanBuskirk, who was making out the inventory at the scene of the search. It was marked by Detective Strickland and Officer VanBuskirk, item number one, and it was placed in our evidence briefcase at the scene.

Q. Did you subsequently do anything with that item?

A. I was in the presence of Detective Strickland when he bagged it in an evidence envelope and marked it to be sent to the lab for analysis." (T. p. 82).

This information was substantiated by Detective Strickland's testimony which followed:

"Q. Showing you Commonwealth's exhibits one through five, do you recognize any of those as being what you recovered from Mr. Mayfield?

A. Item number one was recovered by me from the left hand pants pocket of Mr. Mayfield.

BY THE COURT:

Q. Can you give us the exhibit number? Is that marked on there?

A. Exhibit number three.

BY MR. MOORE:

Q. And what was that that you recovered?

A. It was an Ohio Blue Tip wooden matchbox containing nine wrapped foil packets." (T. Pp. 105, 106).

Finally, the Commonwealth called John Robertson, the Commonwealth's Criminologist who analyzed the contents of the Commonwealth's exhibits 3, 4 and 5, at the State Police laboratories.

Following a side-bar conference, the Court stated:

THE COURT: The counsel have all stipulated that what Mr. Robertson will tell you is that they do contain heroin. He has examined them—was that at the State Police laboratory out at Lawrence Park?

MR. ROBERTSON: Yes, your Honor.

THE COURT: He examined them and found them to be heroin and all counsel have agreed that his testimony will not have to be presented, they agree it is heroin, so you consider he has testified it is heroin, that each packet is heroin, exhibits three, four and five.

MR. MOORE: And all the packets inside within those, the smaller packets inside.

THE COURT: And each packet inside each big pack, each matchbox, is heroin.

MR. MOORE: Yes, your Honor.

THE COURT: All right, it's all heroin." (T. Pp. 124, 125).

In our opinion, the above evidence was clearly sufficient to establish a reasonably unbroken chain of custody and control of the demonstrative evidence admitted into evidence; moreover, we are fully satisfied that the packets of heroin examined by the Crime Lab and admitted into evi-

dence by the trial court were the same as those found on the person of the Appellant.

Judgment of sentence should be affirmed.

PRICE and VAN der VOORT, JJ., join in this opinion.

## OPINION IN SUPPORT OF REVERSAL

CERCONE, Judge.

I dissent. I would grant appellant a new trial.

The lower court allowed the following cross-examination by the Commonwealth of a witness who had testified as to appellant's good reputation:

"Q.  During any of the times when you were having these conversations with other people regarding his law-abid-edness [sic] and his peacefulness did any of them mention the fact that he had been convicted of attempted armed robbery?

MR. SCARPITTI: Your Honor, I would object. We don't know when that was.

THE COURT: What year?

MR. MOORE: 1966.

MR. SCARPITTI: Your Honor, I am objecting; it is too remote in time to the year 1976.[1]

THE COURT: Objection overruled. Go ahead.

A.  Did anyone ever discuss that with me?

Q.  Yes.

A.  No, because probably if I had known it, you know, we would never have gone into business together, you know.

Q.  And did anyone ever discuss the fact that he received a bad conduct discharge from the Army in 1965?

MR. SCARPITTI: Same objection, your Honor.

THE COURT: All right, same ruling.

A.  No."

1.  In fact, the trial took place in March of 1977.

The traditional justification for the rule allowing reputation witnesses to be cross-examined as to otherwise inadmissible past misconduct of the defendant is that the questions show that the witness is either unfamiliar with the defendant's reputation or misguided as to what constitutes good reputation. The rule is a relic of an earlier era in that it assumes that the defendant's past transgressions will inevitably have come to the attention of the community and damaged his reputation. The assumption is of dubious validity in a mobile, urban society; the questions show, at most, that the good reputation attributed to the defendant is undeserved. The rule also makes the unrealistic assumption that the jury will consider the evidence as bearing only on the credibility of the witness and will not use it directly against the defendant. Compare *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). It allows the prosecution to do indirectly what it cannot do directly and creates an intolerable risk that the defendant will be judged by isolated past misdeeds. I would abolish it. When a witness is inventing a good reputation for a disreputable defendant, it is open to the prosecution to call its own witnesses to show bad reputation.

However, appellant does not ask us to abolish the rule; his objections at trial went to remoteness. The Commonwealth, in the one paragraph its brief devotes to the issue, impliedly concedes that both incidents were too stable to impeach *appellant's* credibility, see *Commonwealth v. Bighum,* 452 Pa. 554, 307 A.2d 255 (1973), but asserts that the staleness standard is different when a reputation witness is being cross-examined. I am not convinced that there is a difference in the standard. I *am* convinced that both the discharge and the prior conviction were too remote in time to have any bearing on the credibility of the witness, particularly in view of appellant's youth at the time of the incidents (he was born November 15, 1946), and the witness' admission that she had only known appellant for two years. To regard the witness' negative answers as impeaching her credibility, we would have to believe that appellant's misconduct was

still the subject of community comment more than ten years after it occurred.[2] It is more likely that appellant had redeemed himself in the eyes of the community with the result that local gossip had turned to fresher topics. The impeachment value of the questions was therefore negligible and was overwhelmingly outweighed by their inflammatory potential. The questions should not have been allowed, and I would accordingly reverse.

## OPINION IN SUPPORT OF REVERSAL

SPAETH, Judge:

I would not abolish the rule allowing a reputation witness to be cross-examined concerning past misconduct of the defendant. This rule is based on the peculiarities of the character evidence doctrine and affords the prosecution an effective means of attacking the credibility of a reputation witness called by the defendant. *See generally Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948). Such evidence is invariably prejudicial because it may lead the fact-finder to view the past misconduct of the accused as significant in determining his present guilt, but so long as the evidence is admitted solely for the purpose of impeaching the credibility of the reputation witness and the jury is instructed as to its limited purpose, it should be admitted despite its prejudicial effect. Where the past misconduct occurred long before the trial, however, its remoteness may outweigh its effectiveness as a device for impeachment. In such a case the evidence should not be allowed for it lacks probative value on the issue of credibility and serves only to prejudice the defendant. As Mr. Justice Jackson stated in *Michelson v. United States, supra* :

> The inquiry here concerned an arrest twenty-seven years before the trial. Events a generation old are likely to be lived down and dropped from the present thought and talk of the community and to be absent from the knowledge of younger or more recent acquaintances. The

2. Of course, it is entirely possible that the community never knew about appellant's bad conduct discharge.

court in its discretion may well exclude inquiry about rumors of an event so remote, unless recent misconduct revived them.
335 U.S. at 484, 69 S.Ct. at 222.

The trial judge abused his discretion in this case when he permitted the Commonwealth to question the witness concerning misconduct that had occurred some eleven years before the trial. The credibility of the witness was not impeached, for she had testified that she had known the defendant for only two years, and she based her opinion concerning his character on that two year period.[1] It is clear that the prejudicial impact of this evidence far outweighed its probative value as an impeachment device. Since it could not serve the sole purpose for which it could be offered—impeaching the credibility of this witness—it should have been excluded.

JACOBS, President Judge, joins in this opinion.

---

1. In *Michelson v. United States, supra,* the evidence of the twenty-seven year old arrest was properly introduced to impeach witnesses whose character testimony was based on their having known the defendant for the past thirty years.